## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETER SCHATZBERG, D.C.<br>1726 S. Broad Street<br>Phila., Pa. 19145<br>And | :<br>:<br>: | CIVIL ACTION |
| PHILADELPHIA PAIN MANAGEMENT, INC.<br>1726 S. Broad St.<br>Phila., Pa. 19145 | :<br><br>: | NO. 2010-CV-2900 |
| Vs. | : | JURY TRIAL DEMANDED |
| STATE FARM MUTUAL AUTOMOBILE<br>INSURANCE COMPANY<br>and<br>STATE FARM FIRE & CASUALTY COMPANY | :<br>:<br>:<br>: | |

## AMENDED COMPLAINT

### JURISDICTION & VENUE

Jurisdiction in this matter is founded upon diversity of citizenship of the parties and the amount in controversy pursuant to 28 U.S.C. §1322, in that plaintiffs, PETER SCHATZBERG, D.C. and PHILADELPHIA PAIN MANAGEMENT, INC., are citizens and residents of the Commonwealth of Pennsylvania, and defendants, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE & CASUALTY COMPANY, are believed and therefore averred to be corporations with their principal place of business located in the State of Illinois; and the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of interest and costs.

This Court also has jurisdiction over this matter pursuant to 28 U.S.C. §1331 whereas a federal question is at issue based upon the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§1964(c) and (d).

VENUE is proper in this Court pursuant to 28 U.S.C. §1391(a).

## THE PARTIES

1.    Plaintiff, Peter Schatzberg, D.C. (hereinafter "Dr. Schatzberg"), is a citizen and resident of the Commonwealth of Pennsylvania, with a business address of 1726 S. Broad Street, Philadelphia, Pa. 19145.

2.    Philadelphia Pain Management, Inc. is a Pennsylvania corporation with a business address of 1726 S. Broad Street, Philadelphia, Pa. 19145, which operates as Philadelphia Pain Management and the sole shareholder of which is Dr. Schatzberg.

3.    Defendant, State Farm Mutual Automobile Insurance Company is upon information and belief a corporation existing under the laws of Illinois, duly organized and licensed to engage in the writing of automobile insurance policies in the Commonwealth of Pennsylvania, with a principle place of business at 1 State Farm Drive, Concordville, Pa. 19339-0001.

4.    Defendant, State Farm Fire and Casualty Company is upon information and belief a corporation existing under the laws of Illinois, duly organized and licensed to engage in the writing of automobile insurance policies in the Commonwealth of Pennsylvania, with a principle place of business at 1 State Farm Drive, Concordville, Pa. 19339-0001.

5.    The State Farm Companies shall be hereinafter referred to as "State Farm," and all references to "State Farm" shall apply equally to both entities.

6.    State Farm provides insurance coverage to its customers for, *inter alia*, medical payments, uninsured motorist benefits, underinsured motorist benefits, and liability payments for bodily injury arising out of automobile accidents.

7.    Dr. Schatzberg is a licensed chiropractor who is the sole owner of a large chiropractic and pain management practice with four locations in Delaware, Philadelphia, and Delaware County included amongst which is Philadelphia Pain Management at 1726 S. Broad Street in Philadelphia.

8.    Many of Dr. Schatzberg's patients have suffered injuries which are related to automobile accidents, the treatment for which is often billed to insurance companies like State Farm under the benefits required to be provided by the Pennsylvania Motor Vehicle Responsibility Law (75 Pa.C.S. §1701, et. seq.).

9.    The vast majority of Dr. Schatzberg's patients are African-American.

10.   Because he has a large practice which is a source of auto claim expense to State Farm Insurance Company, Dr. Schatzberg's practice has been targeted for destruction by State Farm.

11.   State Farm is attempting to eliminate Dr. Schatzberg's practice as a source of auto claim expense by falsely accusing him of having engaged in fraudulent business activity, by creating the false perception in the community that he has engaged in professional impropriety, and by engaging in a pattern of racketeering activity with others in order to systematically pay significantly less than is legally owed on all treatment provided by Plaintiffs to State Farm insureds.

12.   Spearheading the attack on Dr. Schatzberg from inside State Farm is a claims adjuster in State Farm's Special Investigations Unit named Doug Babin.

13.   Working closely with and at the direction of Mr. Babin in the attack on Dr. Schatzberg is the law firm of Goldberg, Miller & Rubin, P.C., a peer review company named Rehabilitation Planning, Inc., and a chiropractor named Jane McBride.

14.     State Farm has no evidence that Dr. Schatzberg has committed any wrongdoing, and certainly has no evidence that Dr. Schatzberg or his practice has engaged in any fraudulent activity.

15.     In order to understand why State Farm is attacking Dr. Schatzberg and his practice with false accusations of racketeering activity, one must first understand how and why State Farm manufactures profit by reducing claim payouts regardless of a claim's true value.

## THE MCKINSEY/ACE PROGRAM

16.     In 1993, State Farm contracted with the global consulting firm McKinsey and Company, Inc. to perform a comprehensive evaluation of State Farm's claims practices.

17.     The purpose of the consultation was for McKinsey to advise State Farm how to make more money by reducing expenses associated with auto and fire claims.

18.     McKinsey's recommendations were ultimately very simple, even though they turned traditional principals of insurance claim handling on their head – McKinsey told State Farm to prioritize profit over the interests of its policy holders and claimants.

19.     Simply put, McKinsey told State Farm to pay less in claims in order to make more profit.

20.     In order to implement this shift to prioritizing profits over policyholders, State Farm developed its "Advancing Claims Excellence" or "ACE" program.

21.     ACE was a dramatic shift in claim philosophy designed to maximize profit by paying as little as possible in all types of claims, but most significantly in auto related claims, regardless of the claim's true value.

22.     ACE included unique methodology and new terminology, and the processes developed were implemented on a nationwide basis for both Auto and Fire claims.

23.  The potential windfall to State Farm by implementing ACE's methods was staggering. As State Farm Vice-President Jim Rutrough stated in State Farm's 1995 Annual Report, "ACE has the potential of taking a *billion* dollars of cost out of our system every year."

24.  Acting in concert with State Farm claims executives across the country McKinsey reviewed thousands of both closed and open claim files in order to make findings and recommendations on how State Farm could go about paying less in auto related claims.

25.  McKinsey identified payouts in soft tissue injury claims as the area in which payments could be most greatly reduced and maximum profit realized.

26.  McKinsey expressed to State Farm its opinion that a certain percentage of these claims always involve fraud or exaggeration of some kind, and that in order to reduce the number of such claims and the payouts on them, State Farm should simply identify and attack *all* such claims as fraudulent and/or exaggerated.

27.  In order to profile the vast majority of the claims it receives as potentially fraudulent however, State Farm had to invent an entirely new, and completely bogus, definition of fraud.

28.  State Farm's new definition of fraud manifested itself as a weighted scale of "indicators" which, if present in a claim, allows State Farm to characterize, investigate, and vastly reduce the claim by, at the very least, creating the perception of fraud.

29.  The number one indicator of fraud on State Farm's scale is soft tissue injury.

30.  In other words, any auto accident victim claiming to have suffered a soft tissue injury is automatically characterized by State Farm as potentially fraudulent.

31.   It naturally follows of course that any doctor who confirms the existence of soft tissue injuries from an auto accident is also therefore branded potentially fraudulent under State Farm's scheme.

32.   State Farm receives approximately 30,000 auto related injury claims a day, more than 75% of which involve claims for soft tissue injuries.

33.   The vast majority of soft tissue injury claims made to State Farm involve treatment with a chiropractor.

34.   So not only did State Farm in one fell swoop arbitrarily begin a system of characterizing the vast majority of claims it receives every day as fraudulent, it created a corporate culture which treats the entire chiropractic industry as fraudulent as well.

35.   In addition to soft tissue injuries and chiropractic treatment, another indicator of fraud on the State Farm scale is the race or economic status of the claimant.  If a claimant is a minority, an immigrant, or from a poor, urban area, State Farm automatically looks on their claims as potentially fraudulent.

36.   Under this scheme therefore, a bill for treatment of soft tissue injuries suffered by an African-American from a large city sent to State Farm by a chiropractor is considered potentially fraudulent before it is even removed from the envelope.

37.   State Farm's ACE program, in essence, manufactured an epidemic of fraudulent claims based on arbitrary and racially discriminatory criteria, just to give itself an excuse to dramatically cut the amount of money it pays out on claims every year – to the tune of a billion dollars annually.

38.   Having in one fell swoop arbitrarily branded the vast majority of the 30,000 auto claims it receives daily as potentially fraudulent, State Farm was obviously required to

significantly beef up its fraud units, also known as Special Investigations Units (or "SIU"), in each region of the country.

39.  State Farm's SIU does nothing but investigate fraud.

40.  McKinsey told State Farm that because it is so well known that the SIU only investigates fraud, aggressive investigations conducted by the SIU, in and of themselves are effective in reducing payouts on soft tissue claims.

41.  State Farm therefore created a new workflow model whereby a far greater percentage of claims involving soft tissue injuries, and/or any of the other "fraud indicators", would be funneled to the SIU for a very public and aggressive "investigation."

**IMPLEMENTATION OF ACE IN PENNSYLVANIA**

42.  The ACE review of claim files and rollout of the program in Pennsylvania occurred from June of 1998 through February of 1999, and the program's claims handling culture was implemented in Pennsylvania over time thereafter.

43.  Pennsylvania's SIU offices were accordingly expanded during this time period, with several new investigators added, including, but not limited to, Doug Babin, who was transferred to the SIU unit in 1998.

44.  As part of the ACE initiative in Pennsylvania, the SIU, located in Concordville, began targeting doctors and medical facilities in the Philadelphia area as suspected frauds, all of which providers performed largely chiropractic type treatment on patients claiming soft tissue injuries in auto accidents, and all of which were either staffed by immigrant doctors and/or treated largely minority or immigrant patient populations.

45.  Whenever a doctor or facility was identified as treating such patients, the SIU would issue "SIU Alerts" concerning the facilities.

46.   The SIU alerts were posted on the company's intranet and intended to alert line claim adjusters to transfer to the SIU any claims in which the target facilities were involved.

47.   The issuance of an SIU alert would also serve to stop all payments to the provider or facility.

48.   Once transferred to them, SIU adjusters (such as Mr. Babin) collect claim files involving a particular provider and open a larger "project file" concerning the provider.

49.   The "project" for Doug Babin and State Farm in each instance is to put the targeted provider out of business, by whatever means necessary, thus eliminating a source of claim expense for State Farm.

50.   Unfortunately, because of the enormous success of the ACE philosophy, simply destroying the providers, regardless of actual wrongdoing, has become the real goal of State Farm's "investigations".

51.   This widened scope of destruction to *all* chiropractic facilities, regardless of wrongdoing, has occurred because State Farm realized early on as it implemented the ACE philosophy that simply creating the perception of wrongdoing by a provider or facility is just as powerful a tool in eliminating the provider as a source of claim expense as is actual proof of wrongdoing.

52.   State Farm recognized that the legal and medical communities in the Philadelphia region are relatively insular, that word of an "investigation" by State Farm quickly spreads, and that such word will quickly serve to isolate and destroy the business of the targeted provider or facility, regardless of any actual wrongdoing.

53.    State Farm has enjoyed great success in eliminating many illegitimate providers and its
       "conviction rate" is so high that the community sees an investigation by State Farm as
       evidence of wrongdoing on the part of the targeted provider.

54.    State Farm is well aware of and actively seeks to exploit this impression by publicly and
       aggressively "investigating" any provider which represents a significant source of claim
       expense.

55.    The following is a partial list of the facilities and medical providers which have been
       targeted by State Farm, mostly under the direction of Doug Babin, over the course of the
       past ten years: Midtown Medical Center, Tabor Chiropractic, Frank Solomon, D.C., Paul
       Bove, D.C., Metropolitan Family Practice, Edward Kanner, D.C., Efim Itin, M.D.,
       American Rehab and Physical Therapy, New Horizont Medical Center, Uma Kanineni,
       M.D., Philly Family Practice, Alexander Tarnopolsky, D.O., Advanced Family Medicine,
       Rennard Healthcare, Arnold Lincow, D.O., Richard Mintz, D.O., 7622 Medical Center,
       Allied Medical Group, Lawrence Forman, D.O., Richard Mintz, D.O., Stephen Sacks,
       D.O., Richard Butow, D.C., Stephen Hennessey, D.C., Allied Medical Associates, Robert
       Cavoto, D.C., Stephen Ficchi, D.O., Frank Shenko, MSPT, Olney Pain Management,
       Bensalem Pain Management, South Philly Pain Management, George Bonafino, D.O.,
       and Professional Physical Therapy Associates.

56.    Upon information and belief, SIU alerts were issued by State Farm with respect to each
       of the above named providers.

57.    Upon information and belief, Doug Babin was involved, either as the leader or as a
       significant participant in the investigations by State Farm into each of the above named
       providers.

## STATE FARM AND CY GOLDBERG, ESQUIRE

58.   An integral part of the ACE methodology is to complement State Farm's SIU adjusters
      with attorneys who can assist in the aggressive investigations of medical providers and
      facilities, drive up litigation costs, and delay adjudication of claims, all so as to wear
      down a plaintiff's willingness to fight for a claim's true value.

59.   More than ten years ago, State Farm, and Doug Babin especially, began relying heavily
      upon an attorney named Cy Goldberg, Esquire and his firm to perform this
      complementary role.

60.   Specifically, over the course of the past ten years, whenever Doug Babin has been
      involved in an investigation of a provider, he has invariably retained Mr. Goldberg's firm
      to assist in the investigation and aggressively litigate any claims involving a targeted
      provider.

61.   Mr. Goldberg's role in the investigation involves everything from performing claim file
      reviews, to defending State Farm insureds in suits brought by patients of a targeted
      facility, to taking sworn statements under oath from State Farm insureds who have
      received treatment from a targeted facility.

62.   In the course of the investigation, Mr. Goldberg uses the civil process to collect
      information about providers and provide an opinion as to whether State Farm might be
      able to use said information to bring a civil lawsuit alleging fraud against the targeted
      provider.

63.   Mr. Goldberg is renowned in the Philadelphia area legal community for his zealous and
      aggressive investigatory tactics, as well as for the multi-million dollar judgments he has
      secured against various providers for fraudulent activity.

64.    State Farm deliberately uses its SIU and Mr. Goldberg to send a clear message to the legal and medical communities that a particular provider or facility is "under investigation" for fraud.

65.    State Farm sends letters to attorneys advising them that a facility or provider is "under investigation" in order to chill the willingness of attorneys to represent clients who have or might receive treatment from the targeted facility or provider.

66.    State Farm also uses the fact that a facility or provider is "under investigation" to stop payment of any bills which emanate from said facility or provider.

67.    Since the year 2001, State Farm has retained Mr. Goldberg's firm to investigate and subsequently bring lawsuits against many of the medical providers against whom SIU alerts had been issued.  The lawsuits were/are captioned as follows:

   a)    State Farm, et. al. v. Midtown Medical Center, et. al., 02-cv-07389 (E.D.Pa.)

   b)    State Farm, et. al. v. Metropolitan Family Practice, et. al., 03-cv-00969 (E.D.Pa.)

   c)    State Farm, et. al. v. American Rehab, et. al, 03-cv-05595 (E.D.Pa.)

   d)    State Farm, et. al. v. New Horizont, Inc. et. al., 03-cv-6516 (E.D.Pa.)

   e)    State Farm, et. al. v. Philly Family Practice, et. al., 05-cv-02081(E.D.Pa.)

   f)    State Farm, et. al. v. Arnold Lincow, M.D., et. al, 05-cv-5368 (E.D.Pa.)

   g)    State Farm, et. al. v. Robert Cavoto, D.C., et. al., 05-10716 (Del.Co. Com.Pl.)

   h)    State Farm, et. al. v. Stephen Ficchi, D.O., et. al., 10-cv-00555 (E.D.Pa.)

68.    State Farm has admitted that the purpose of these civil lawsuits, on which State Farm has spent tens of millions of dollars, is not to collect money, but is rather to send a message of intimidation to the legal community and to chill claims.

69.    Mr. Goldberg's firm has become renowned for its aggressive and single minded pursuit
       of anyone associated with a provider or facility which has been targeted by State Farm,
       and as such, his involvement alone sends State Farm's desired message that a facility is
       being targeted.

**THE ATTACK ON DR. SCHATZBERG**

70.    Dr. Schatzberg is a chiropractor who employs other chiropractors at his facilities who
       treat a largely African-American patient base from the metropolitan Philadelphia region.

71.    Dr. Schatzberg's employees provide professionally appropriate, reasonable, and
       necessary care to all of their patients.

72.    Because of the quality of the treatment provided, and the facilities themselves, Dr.
       Schatzberg's is a large, busy practice.

73.    Unfortunately, because he employs chiropractors, because he treats mostly African-
       American patients, and because the practice is a major source of claim expense, State
       Farm has now targeted Dr. Schatzberg for destruction pursuant to its ACE profit scheme.

74.    Doug Babin is leading the attack on Dr. Schatzberg on behalf of State Farm, and has
       retained Mr. Goldberg to assist.

75.    On June 3, 2010, Mr. Babin left a telephone message for Ms. Arlene O'Brien, a long time
       former employee of Dr. Schatzberg's.

76.    In the telephone message, Mr. Babin stated that he was calling to speak with Ms. O'Brien
       about Dr. Schatzberg.

77.    Ms. O'Brien returned Mr. Babin's call that evening and spoke with him directly on the
       telephone.

78.   Mr. Babin stated, in part, to Ms. O'Brien that he is a "fraud investigator" for State Farm and that he is "investigating the billing practices of Dr. Peter Schatzberg."

79.   Mr. Babin stated that he had already spoken with several other employees of Dr. Schatzberg's practice.

80.   Mr. Babin pressed Ms. O'Brien to schedule a meeting with him in order to ask questions about Dr. Schatzberg and his billing practices.

81.   Based on the totality of the statements made by Mr. Babin, and their aggressive tone, Ms. O'Brien believed that State Farm possesses facts or information that Dr. Schatzberg is engaging in or has engaged in fraudulent billing practices.

82.   Upon information and belief, it is averred that Mr. Babin has had similar telephone conversations with other employees of Dr. Schatzberg's in which similar, if not identical statements have been communicated.

83.   At the same time Mr. Babin has been falsely accusing Dr. Schatzberg of committing fraud in his billing practices, State Farm has retained Mr. Goldberg's office to pursue Dr. Schatzberg as it has so many others in the past.

84.   Mr. Goldberg has enjoyed very public success as an attorney who sues doctors for fraud on behalf of State Farm.

85.   Mr. Goldberg's mere presence in a matter is a deliberate signal that State Farm is targeting a provider, which signal is strengthened when Mr. Goldberg uses the civil process to discover information about the practice which has no relevance to the underlying cases.

86.    State Farm assigned Mr. Goldberg to represent a defendant in the Philadelphia Court of
       Common Pleas case captioned <u>Martin, et. al. v. Cooper, et. al.</u>, October Term, 2008, No.
       2843.

87.    The case was assigned to Mr. Goldberg because the plaintiff, Terry Martin, treated for
       injuries sustained in an automobile accident at Dr. Schatzberg's office.

88.    Terry Martin is African-American.

89.    The purpose of this assignment was to have Mr. Goldberg very publicly utilize the civil
       process to discover information about Dr. Schatzberg's practice, even though said
       information has no relevance to the case, and to create the impression in the legal and
       medical communities that State Farm possesses evidence of impropriety on the part of
       Dr. Schatzberg.

90.    Pursuant to this purpose, Mr. Goldberg's associate compelled the deposition of a billing
       clerk who works for Dr. Schatzberg and spent most of the questioning on the
       administration and mechanics of the practice.

91.    Also, in the same case, Mr. Goldberg's associate demanded that the chiropractor who
       treated the plaintiffs appear and testify at trial of the matter rather than preserve the
       doctor's testimony by videotape.  The purpose of this demand is simply to inconvenience
       the doctor as much as possible and create unwillingness on his part to assist patients in
       litigation.

92.    Another matter which was assigned to Mr. Goldberg's office by State Farm specifically
       to investigate and create a false perception of impropriety by Dr. Schatzberg is the case of
       <u>Graham v. Newsuan</u>, PCCP, January term, 2010, no. 1729.

93.     Angela Graham was injured in an automobile accident and received treatment for her injuries in Dr. Schatzberg's office.

94.     Upon information and belief, the Graham case was funneled to the SIU specifically because the plaintiff treated at Dr. Schatzberg's office for injuries suffered in a motor vehicle accident.

95.     Angela Graham is African-American.

96.     State Farm also assigned to Mr. Goldberg the case of <u>James v. Hub Truck Rental, et. al.,</u> PCCP, January Term, 2008, No. 03390, for the purpose of using it to investigate Dr. Schatzberg and create the false perception of impropriety on his part.

97.     The case was funneled to Mr. Goldberg because the plaintiff, Vincent James, treated for injuries at Dr. Schatzberg's office for injuries suffered in a motor vehicle accident.

98.     Vincent James is African-American.

99.     Also funneled by State Farm to Mr. Goldberg was the first party claim of Anthony Fullwood, a State Farm insured who was injured in an automobile accident and received treatment for his injuries at Dr. Schatzberg's office.

100.    Mr. Fullwood was insured at the time of his accident with State Farm under policy number 1391-187-38.

101.    As a State Farm insured, Mr. Fullwood was entitled to first party medical benefits under his policy.

102.    On March 11, 2010, a Special Investigations Unit adjuster from State Farm named Nova Crespo sent a letter to the offices of Dr. Schatzberg and Mr. Fullwood's attorney stating that Mr. Fullwood's claim for payment of Dr. Schatzberg's medical bills was "under investigation."

103.   Ms. Crespo sent identical letters to the offices of both Dr. Schatzberg and Mr. Fullwood's attorney, on April 12, 2010, and May 20, 2010, again advising Mr. Fullwood's attorney that the claim for medical benefits was "under investigation."

104.   On May 11, 2010, Matthew Moroney, Esquire, an associate of Mr. Goldberg's firm, wrote to Mr. Fullwood's attorney and advised that he had been asked by State Farm to assist in reviewing Mr. Fullwood's claim for medical benefits.

105.   Mr. Moroney's letter asked that Mr. Fullwood provide to him a statement under oath, as required by the State Farm policy.

106.   It is highly unusual for an insurance company to demand a statement under oath from its own insured on a claim for first party medical benefits that is taken by an attorney with a court reporter.

107.   State Farm knows this, Mr. Goldberg knows this, and certainly they expect that the claimant's counsel will know it, such that merely demanding the statement under oath under these circumstances communicates that State Farm has facts or evidence which demonstrates wrongdoing on the part of Dr. Schatzberg.

108.   On June 9, 2010, another associate from Mr. Goldberg's office took a statement under oath from Mr. Fullwood in the presence of a court reporter.  Virtually all of the questioning related to the administration and mechanics of Dr. Schatzberg's practice, rather than the actual treatment Mr. Fullwood received.

109.   The letters from Nova Crespo indicating that Mr. Fullwood's claim for medical benefits is "under investigation," followed by the extraordinary act of taking of a statement under oath by an attorney (from Cy Goldberg's office) in which the questioning centered on the

practice rather than the patient, was intended and did send the clear message that State Farm has evidence of professional impropriety on the part of Dr. Schatzberg.

110.   Again, State Farm has no evidence or facts to suggest that Dr. Schatzberg engaged in any professional impropriety with respect to Mr. Fullwood's treatment or billing, or in any other claimant's billing for that matter.

111.   Anthony Fullwood is African-American.

112.   All of the tactics described above – the false accusations of fraud made by Mr. Babin to Ms. O'Brien and others; the letters from Nova Crespo stating that a claim is under investigation; and the use of the civil process by Mr. Goldberg in various third and first party cases to publicly inquire about the administration and mechanics of Dr. Schatzberg's practice – are all designed to do one thing: create the false impression in the community that Dr. Schatzberg is engaged in fraudulent or otherwise improper professional practices.

113.   The purpose of creating this false impression is to destroy Dr. Schatzberg's business and reputation and thus eliminate yet one more source of claim payments.

114.   At all times material hereto, Doug Babin acted within the course and scope of his employment, agency, and/or representation of State Farm, with the full knowledge and authorization of State Farm to do so.

115.   At all times material hereto, Nova Crespo acted within the course and scope of her employment, agency, and/or representation of State Farm, with the full knowledge and authorization of State Farm to do so.

116.   At all times material hereto, Mr. Goldberg and his associates have acted within the course and scope of their agency, employment, and/or representation of State Farm, with the full knowledge and authorization of State Farm to do so.

## ACE AND ITS DELIBERATE ABUSE OF THE PEER REVIEW PROCESS

117.   State Farm's ACE goal of reducing claims payouts by whatever means necessary also involves the deliberate abuse and manipulation of the peer review processes mandated by Pennsylvania law.

118.   The Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa.C.S. §1701, et. seq., requires automobile insurers to provide coverage for reasonable and necessary medical treatment and rehabilitative services.

119.   So long as treatment is reasonable and necessary, an insurer is legally obligated to pay for said treatment up to the coverage limits of the policy.

120.   The MVFRL provides the mechanism by which an insurer may challenge the reasonableness and necessity of an insured's medical treatment.

121.   An insurer may submit an insured's medical bill to a **peer review** organization ("PRO") for the purpose of confirming that such treatment conforms to the professional standards of performance and is medically necessary.

122.   An insurer may withhold payment of an insured's medical bills while the peer review is occurring.

123.   If a PRO determines that medical treatment was medically necessary, the insurer must pay to the provider any outstanding amount owed plus interest at 12% per year.

124.  If a PRO determines that a provider has provided unnecessary medical treatment or that future provision of such treatment will be unnecessary, the provider may not collect payment for the treatment deemed medically unnecessary.

125.  However, upon challenge of the insurance company's denial of payment on the basis of a peer review, if the court determines that treatment was in fact medically necessary, the insurer must pay to the provider the outstanding amount plus interest at 12%, as well as the costs of the challenge and all attorney fees.

126.  In a case where the court finds that the treatment at issue was medically necessary, an insurer who has engaged in conduct considered to be wanton shall be subject to payment of treble damages to the medical provider who has successfully challenged the insurer's denial of payment.

127.  A medical provider is not required to seek reconsideration of an adverse PRO decision before initiating a court action to recover medical payments owed under an automobile policy.

128.  When an insurer uses the PRO process as a sham to unjustly and unreasonably deny payment of medical bills due and owing under an insurance policy, the insurer acts in bad faith.

129.  As part and parcel of its ACE program, State Farm regularly contracts with specific peer review organizations for the purpose of obtaining biased peer review reports.

130.  State Farm knows and exploits the fact that peer review organizations earn substantial income from State Farm and therefore have a financial interest in providing biased reports which favor State Farm.

## REHABILITATION PLANNING, INC. AND JANE MCBRIDE, D.C.

131.    One of the peer review organizations State Farm regularly contracts with is Rehabilitation Planning, Inc.

132.    Rehabilitation Planning, Inc. has since at least the year 2000 been continuously selling peer review reports which are favorable to State Farm for the purpose of maintaining a steady source of business from State Farm.

133.    Since the year 2000, the number of peer reviews sold to State Farm by Rehabilitation Planning has increased steadily.

134.    Rehabilitation Planning has sold to State Farm a variety of other services over the years including, but not necessarily limited to: medical case management, independent medical examination, and utilization reviews.

135.    Upon information and belief, from 1996 through 2005, Rehabilitation Planning was paid $3,156,445.97 for various "services" sold to State Farm.

136.    Upon information and belief, $1,340,372.00 of this amount was just for Pennsylvania "services".

137.    Rehabilitation Planning's peer reviews are shams which provide findings favorable to State Farm to secure a steady stream of business, a fact of which State Farm is not only aware, but motivates the referrals in the first place.

138.    The doctor to whom Rehabilitation Planning, Inc. invariably assigns these sham peer reviews of chiropractic treatment is Jane McBride, D.C.

139.    State Farm in fact knows and expects that a peer review request made to Rehabilitation Planning will very likely end up in an assignment to Dr. McBride.

140. Many of the chiropractic peer reviews in Pennsylvania sold annually by Rehabilitation Planning to State Farm are allegedly conducted by Dr. McBride.

141. Dr. McBride graduated from chiropractic school in 1995.  While still a student, she was already selling her services to insurance companies to "assemble" and "preview" case files for utilization review doctors.

142. As of 1997, Dr. McBride was selling her services as a "peer" reviewer directly to multiple PRO/URO organizations.

143. Dr. McBride has done hundreds (if not thousands) of peer reviews for State Farm.

144. Upon information and belief, Dr. McBride has earned hundreds of thousands of dollars performing peer reviews and other services for State Farm.

145. State Farm knows and relies upon the fact that Dr. McBride has a substantial financial interest in providing biased reports which favor State Farm.

146. State Farm has repeatedly sought to use Dr. McBride's peer reviews as an excuse to cut off medical benefits to hundreds (if not thousands) of State Farm insureds, even though it knows that Dr. McBride's reports are biased and lack credibility.

147. State Farm's use of Dr. McBride as a peer reviewer is a sham as State Farm knows and expects that she will always conclude that some significant portion of an insured's treatment was or is unnecessary.

148. Dr. McBride's practice is to hide her bias by falsely creating the perception of objectivity in purporting to find some portion of a patient's treatment reasonable and necessary.

149. State Farm is aware of and actively exploits this deceptive practice in order to reduce claims payouts.

150.   Pursuant to the peer review regulations, 31 Pa.Code §69.52(b), medical bills incurred more than 90 days prior to notice of a peer review are not subject to review.

151.   However, in her peer review reports, Dr. McBride invariably identifies treatment which is not legally subject to review as having been reasonable and necessary, while consistently deeming unreasonable and unnecessary the treatment which is legally subject to review.

152.   State Farm has been on actual notice of this intentionally deceptive practice of Dr. McBride's since at least May 2, 2008.

153.   State Farm is also aware of another deceptive practice of Rehabilitation Planning and Dr. McBride: that of selectively reviewing medical records so as to avoid the conflicting findings of medical doctors with higher specialties than Dr. McBride.

154.   Dr. McBride intentionally ignores diagnostic test results, surgical procedures, and recommendations of consulting specialists in order to provide her biased reports.

155.   State Farm is aware of and relies on this deceptive practice of Dr. McBride's in order to reduce claims payouts.

156.   State Farm has also been on actual notice of other misconduct by Dr. McBride with respect to the authenticity and credibility of her "expert" reporting, specifically in conjunction with State Farm's deployment of Cy Goldberg, Esquire to implement the ACE strategy.

157.   In the very first two fraud cases filed by Mr. Goldberg's office on behalf of State Farm against Philadelphia medical providers, State Farm, et. al. v. Midtown Medical Center, et. al., 02-cv-07389 (E.D.Pa.), and State Farm, et. al. v. Metropolitan Family Practice, et. al., 03-cv-00969 (E.D.Pa.), Dr. McBride was proffered by State Farm as its "expert" on various issues in each case.

158. In the <u>Metropolitan</u> case, Dr. McBride purported to author an expert report dated October 5, 2004.

159. In her report of October 5, 2004, Dr. McBride included synopses of State Farm claim files which she claimed to, but did not in fact author.

160. State Farm was on actual notice as of June 7, 2005, that Dr. McBride allowed an "expert" report, which she had not actually written, to be submitted to the Court under her name by Cy Goldberg, Esquire.

161. Dr. McBride's willingness to sell her name for use by State Farm in its quest to reduce claims payouts by whatever means necessary is the main reason State Farm has so consistently used Dr. McBride as a peer reviewer.

162. State Farm knows or recklessly disregards the obvious fact that Dr. McBride is not a credible or independent source for peer review.

163. Despite clear knowledge and notice of Dr. McBride's total lack of objectivity and/or credibility, and in fact, precisely because of it, State Farm has continued to utilize peer reviews allegedly conducted by Dr. McBride as an excuse to cut off the medical benefits of its insureds.

164. It is part and parcel of the ACE methodology for reducing claims payouts to use biased peer review organizations and doctors while pretending to comply with the PRO regulations.

**STATE FARM'S USE OF DR. MCBRIDE AGAINST DR. SCHATZBERG**

165. State Farm has repeatedly used Rehabilitation Planning and Dr. McBride to obtain biased and blatantly illegal peer review reports to manufacture a basis to cut off payments owed to Dr. Schatzberg's practice for treatment rendered to State Farm insureds.

166.   For example, on February 7, 2008, a patient named James Nelson presented to Philadelphia Pain Management, a facility owned by Dr. Schatzberg, for treatment related to a motor vehicle accident which occurred on October 6, 2007.

167.   At the time of his accident, Mr. Nelson was insured by State Farm under a policy of insurance which provided first party medical benefits in accordance with the Pennsylvania MVFRL.

168.   Philadelphia Pain Management provided reasonable and necessary medical treatment to Mr. Nelson for his injuries from February 7, 2008 through January 15, 2009.

169.   Beginning on May 7, 2008, Philadelphia Pain Management timely submitted to State Farm invoices for the treatment it had rendered to Mr. Nelson to that point.  Subsequent invoices were sent on May 13, May 19, and May 21.

170.   All of these invoices were received by State Farm prior to May 27, 2008.

171.   On August 27, 2008, the adjuster assigned to handle Mr. Nelson's first party benefit claim decided to seek a peer review of Mr. Nelson's treatment at Philadelphia Pain Management.

172.   Under Pennsylvania law, a medical provider's bill shall be referred to a PRO only when circumstances or conditions cause a prudent person, familiar with PRO procedures, standards and practices, to believe it necessary that a PRO determine the reasonableness and necessity of care.

173.   Upon information and belief, however, State Farm provides little to no training to its claims adjusters regarding PRO procedures, standards and practices.

174.   Upon information and belief, the claim adjuster who made the determination that Mr. Nelson's treatment should be referred for a peer review was Tim Lewis.

175.   Upon information and belief, Tim Lewis had little to no training in PRO procedures, standards and/or practices at the time he made the referral of Mr. Nelson's treatment for a peer review.

176.   Upon information and belief, the referral of Mr. Nelson's treatment for peer review was based on nothing more than the ACE culture of claims handling at State Farm, which is designed to reduce claim payouts regardless of State Farm's good faith obligations to make them.

177.   It bears noting here that Mr. Nelson is African-American and he resides in Philadelphia.

178.   On August 27, 2008, State Farm sent a letter to Rehabilitation Planning asking them to assign a peer reviewer to review the treatment of Mr. Nelson.

179.   Consistent however with the ACE culture of artificially reducing claims payouts, State Farm forwarded to Rehabilitation Planning only the Application for Benefits filled out by Mr. Nelson, and the medical bills and reports of Philadelphia Pain Management.

180.   State Farm deliberately excluded from the records it provided to Rehabilitation Planning the records of Mr. Nelson's extensive pain management treatment with Dr. Lance Yarus, a Board Certified D.O.

181.   Dr. Yarus' records reflected the fact that he administered multiple series of epidural injections into Mr. Nelson's low back beginning in January of 2008 and continuing through April of 2009.

182.   Dr. Yarus' records further reflect that on 5/29/08 (and on 10/20/08 and 1/8/09), he recommended continued therapy for Mr. Nelson.  Dr. Yarus discharged Mr. Nelson from his active care on the date of his last epidural injection, April 2, 2009.

183.   State Farm's request for peer review, made on August 27, 2008, identified the treatment
period to be reviewed as February 2, 2008 through August 16, 2008.

184.   This request for peer review, on its face, violated Pennsylvania law in that it sought peer
review of treatment for which State Farm had received a bill more than 90 days earlier.

185.   State Farm deliberately included a period of treatment which was legally unreviewable in
order to facilitate Rehabilitation Planning and Dr. McBride's deceptive practice of
finding such periods of treatment reasonable and necessary.

186.   As was expected by State Farm, Rehabilitation Planning assigned this (illegal) review to
Dr. McBride.

187.   On September 17, 2008, Rehabilitation Planning received all of the records of Mr.
Nelson's treatment from Philadelphia Pain Management, including the records of Dr.
Yarus.

188.   On that same day, September 17, 2008, Rehabilitation Planning sent records to Dr.
McBride.

189.   On October 15, 2008, a peer review report allegedly authored by Dr. McBride was issued
by Rehabilitation Planning and provided to State Farm.

190.   If Rehabilitation Planning included the records of Dr. Yarus in those sent to Dr. McBride,
it is clear that Dr. McBride did not review the records of Dr. Yarus, or, if she did, Dr.
McBride deliberately chose to ignore them because they conflicted with her true purpose
of helping State Farm avoid payment of Mr. Nelson's medical bills.

191.   On October 16, 2008, State Farm adjuster Jamie Arnold sent to Dr. Schatzberg the peer
review report of Mr. Nelson's treatment, which was allegedly prepared by Dr. McBride.

192.   The report allegedly authored by Dr. McBride identified the treatment provided to Mr. Nelson from February 7, 2008 through April 5, 2008 as medically necessary.

193.   Given the date of the referral by State Farm for peer review, and the dates on which State Farm had received the bills for Mr. Nelson's treatment, of course, this time frame was not even legally reviewable.

194.   The finding that treatment rendered between February 7, 2008 and April 5, 2008 was reasonable and necessary was Dr. McBride's usual attempt to deceive the reader of the report into believing that it was unbiased and independently authored.

195.   Based solely on the report allegedly authored by Dr. McBride, State Farm adjuster Jamie Arnold denied payment of the bills for Mr. Nelson's treatment beyond April 5, 2008.

196.   In doing so, State Farm and Dr. McBride intentionally excluded from review any of the reports of Dr. Yarus which documented Mr. Nelson's need for continued therapy from May 29, 2008 through January 8, 2009.

197.   Regardless of the biased and blatantly nescient findings allegedly made by Dr. McBride, however, State Farm was required by law to pay for all treatment rendered for which it had received bills before May 27, 2008.

198.   State Farm's denial of payment for bills beyond April 5, 2008 on the basis of Dr. McBride's alleged report was not just in violation of its duty of good faith and the law of Pennsylvania, it also violated the dictates of State Farm's own claims manual.

199.   State Farm's Auto Claims Manual requires its adjusters to use peer review reports in conjunction with all other relevant information in the file to make the proper payment determination.

200. It is apparent, however, that, in breach of this obligation, State Farm relied solely on the obviously biased, intentionally nescient, and illegal-on-its-face peer review report allegedly authored by Dr. McBride in denying payment to Dr. Schatzberg.

201. The total amount of bills which remain unpaid as the result of the biased, illegal peer review allegedly conducted by Dr. McBride is $3,608.00.

202. On April 8, 2010, Dr. Schatzberg filed suit against State Farm in the Philadelphia Court of Common Pleas for the unpaid medical bills of James Nelson.

203. As with all of the other matters described more fully throughout this Complaint, and for the reasons stated therein, State Farm immediately assigned the defense of the case to Cy Goldberg, Esquire, who entered his appearance in the case on May 6, 2010.

204. On June 4, 2010, Mr. Goldberg filed State Farm's Answer to the Complaint filed by Dr. Schatzberg.

205. On June 23, 2010, Mr. Goldberg notified Dr. Schatzberg's counsel that he intended to serve wide-ranging and overly broad subpoenas in the case upon two separate law firms (as well as an insurance company) to produce documents.

206. As State Farm was obviously deploying Mr. Goldberg yet again to use this minor PIP lawsuit to send its false and defamatory messages about Dr. Schatzberg, the lawsuit was withdrawn without prejudice.

207. All of State Farm's actions described more full above have been and are deliberate, malicious, wanton, and reckless.

## COUNT I
## DR. PETER SCHATZBERG V. STATE FARM
## DEFAMATION

208. All preceding paragraphs are incorporated herein by reference.

209. The defendant has defamed Dr. Schatzberg through the actions described more fully in the preceding paragraphs.

210. The content of the defendant's statements and the deliberate messages sent by its actions, by and through its authorized representatives, orally and in writing to third parties concerning Dr. Schatzberg, would tend to harm (and have harmed) Dr. Schatzberg's reputation so as to lower Dr. Schatzberg in the estimation of the community and/or to deter third persons from associating or dealing with Dr. Schatzberg.

211. State Farm has published the written and oral statements and communicated its message through its actions described above to third parties, including Dr. Schatzberg's employees, consulting physicians, and attorneys.

212. The defendant has also slandered Dr. Schatzberg.

213. The defendant's statements (both libelous and slanderous) clearly applied to Dr. Schatzberg.

214. The third party recipients of the defamatory statements would (and have) understood the defendant's authorized representatives to be saying that facts exist which indicate that Dr. Schatzberg has engaged in fraudulent and/or otherwise improper and/or illegal professional conduct.

215. The defendant's defamatory statements impute to Dr. Schatzberg conduct, characteristics, and/or a condition that would adversely affect Dr. Schatzberg in his lawful business or trade.

216. The defendant's defamatory statements were defamatory per se.

217.   The defendant's actions as described above have also been designed to communicate and have communicated to the community the false allegation that Dr. Schatzberg is or has engaged in fraudulent activity or other professional impropriety.

218.   Dr. Schatzberg has suffered actual damages and/or special harm including monetary and/or out of pocket loss caused by the defendant's defamations.

219.   Dr. Schatzberg has suffered general damages as a result of defendants' defamations including loss of reputation, anxiety, emotional distress, and sleeplessness.

220.   State Farm has acted negligently, recklessly, wantonly, willfully, deliberately, and/or maliciously.

221.   Neither State Farm's nor its authorized representatives' conduct is privileged.  In the alternative, to the extent a privilege may apply, State Farm and its authorized representatives have abused that privilege.

WHEREFORE, plaintiff, Dr. Peter Schatzberg, demands damages from defendant, State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company, jointly and/or severally, in a sum in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus reasonable attorney's fees, interest, punitive damages, and all applicable costs.

## COUNT II
## DR. PETER SCHATZBERG V. STATE FARM
## FALSE LIGHT INVASION OF PRIVACY

222.   All preceding paragraphs are incorporated herein by reference.

223.   By their actions described more fully above, the defendants have given publicity to a matter concerning Dr. Schatzberg that has placed him before the public in a false light.

224.   Specifically, defendants gave publicity to their false allegations of fraud and professional impropriety on the part of Dr. Schatzberg by:

a)      Sending letters to Dr. Schatzberg's office and the office of the attorney for Anthony Fullwood indicating that Mr. Fullwood's claim was "under investigation" while at the same time, sending letters and scheduling the highly unusual statement under oath of Mr. Fullwood by an associate of Mr. Goldberg's in which all of the questioning centered on the administration and mechanics of Dr. Schatzberg's practice;

b)      Doug Babin's direct conversations with Arlene O'Brien and an unknown number of other employees of Dr. Schatzberg's in which Mr. Babin stated he was investigating Dr. Schatzberg for alleged fraudulent billing practices;

c)      Communicating to the attorneys, court reporters, Judges, and assorted other individuals involved in the James v. Hub Truck Rental, Graham v. Newsuan, and other cases that State Farm has facts or evidence to suggest fraudulent activity or other impropriety on the part of Dr. Schatzberg; and

d)      Other such acts which are as yet unknown but will be revealed in discovery of this matter.

225.    The false light in which Dr. Schatzberg has been placed would be highly offensive to a reasonable person.

226.    State Farm knew its allegations (direct and indirect) of fraudulent activity and professional impropriety by Dr. Schatzberg are false and/or recklessly disregarded the falsity of the allegations and the false light in which Dr. Schatzberg would be placed thereby.

227.    Dr. Schatzberg has suffered actual damages and/or special harm including monetary and/or out of pocket loss caused by the defendant's false light invasion of privacy.

228.   Dr. Schatzberg has suffered general damages as a result of defendants' false light invasion of privacy including loss of reputation, anxiety, emotional distress, and sleeplessness.

WHEREFORE, plaintiff, Dr. Peter Schatzberg, demands damages from defendant, State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company, jointly and/or severally, in a sum in excess of Fifty Thousand ($75,000.00) Dollars, plus reasonable attorney's fees, interest, punitive damages, and all applicable costs.

### COUNT III
### PHILADELPHIA PAIN MANAGEMENT, INC. V. STATE FARM
### VIOLATION OF THE PENNSYLVANIA MOTOR VEHICLE FINANCIAL
### RESPONSIBILITY LAW

229.   All of the preceding paragraphs are incorporated herein as if fully set forth at length.

230.   Defendant's actions in contracting with and utilizing a peer review organization for the illegal and improper purpose of obtaining a biased peer review report with respect to the treatment rendered to James Nelson and countless other State Farm insureds, and by falsely relying on said report to deny payment to Plaintiff, Defendant violated the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. §1701, et. seq.

231.   State Farm knew or should have known that Dr. McBride is not a credible or unbiased peer reviewer.

232.   State Farm knew or should have known that Dr. McBride's peer review report concerning the treatment of James Nelson was a sham.

233.   By virtue of Defendant's violation of the Pennsylvania Motor Vehicle Financial Responsibility Law, Defendant must pay to Plaintiff the outstanding amount owed ($3,608.00), plus 12% interest and all attorney's fees incurred by Plaintiff in order to obtain payment from Defendant.

WHEREFORE, Plaintiff, Philadelphia Pain Management, hereby demands judgment in its favor in the amount of Three thousand, six hundred, and eight ($3,608.00) Dollars, plus 12% interest and all attorney's fees and costs.

**COUNT IV**
**DR. PETER SCHATZBERG AND PHILADELPHIA PAIN MANAGEMENT, INC.**
**V. STATE FARM**
**VIOLATION OF 42 PA.C.S. §8371 (BAD FAITH)**

234.  All of the preceding paragraphs are incorporated herein as if fully set forth at length.

235.  42 PA.C.S. §8371, Pennsylvania's "Bad Faith Statute" is a statute of general applicability which provides for recovery against insurers who act in bad faith.

236.  Defendant's corporate strategy of contracting with financially motivated peer review organizations for the purpose of obtaining biased and inaccurate peer review reports to deny payments owed under the Pennsylvania Motor Vehicle Financial Responsibility Law is both frivolous and unfounded and motivated by a dishonest purpose.

237.  State Farm's long history of purchasing the use of Dr. Jane McBride's name on peer reviews and other expert reports when State Farm knows or should have known that Dr. McBride is biased, lacks credibility, and is not an independent, objective reviewer, is both frivolous and motivated by a dishonest purpose.

238.  State Farm has deliberately failed to investigate Dr. McBride's qualifications or bias and/or her relationship with Rehabilitation Planning, Inc. in order to continue using reports ascribed to Dr. McBride as an excuse to reduce claims payouts.

239.  State Farm regularly abuses the PRO process as described more fully above in order to reduce claims payouts.

WHEREFORE, Plaintiff, Philadelphia Pain Management, hereby demands judgment in its favor in the amount of Three thousand, six hundred, and eight ($3,608.00) Dollars, plus interest, punitive damages, court costs, and all attorney's fees.

### COUNT V
### DR. PETER SCHATZBERG & PHILADELPHIA PAIN MANAGEMENT, INC. V. STATE FARM
### VIOLATION OF 18 U.S.C §§1962(c) & 194(c)
### RICO

240. All of the preceding paragraphs are incorporated herein as if fully set forth at length.

241. Plaintiffs are "persons" within the meaning of 18 U.S.C. §1961(3) and 1964(c).

242. Defendants are "persons" within the meaning of 18 U.S.C. §1961(3) and 1962(c).

243. At all times material hereto, but since at least the year 2000, State Farm, Rehabilitation Planning, Jane McBride, D.C., and the law firm of Goldberg, Miller & Rubin, P.C., have been and continue to be associated in fact and thus constitute an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c)(hereinafter "the enterprise").

244. The enterprise has been and continues to be centrally controlled by State Farm for the purpose of effectuating the ACE scheme outlined above.

245. At all times material hereto, the enterprise was engaged in and its activities affected interstate commerce and the facilities of interstate commerce, including the United States mails, highways, and telephone lines.

246. At all times material hereto, State Farm, Rehabilitation Planning, Inc., Jane McBride, D.C., and Goldberg, Miller & Rubin, P.C. were employed by or otherwise associated with the enterprise.

247.   From at least 2000 through to the present and continuing into the future, State Farm, Rehabilitation Planning, Inc., Jane McBride, D.C., and Goldberg, Miller & Rubin, P.C., devised and participated in a scheme to defraud Plaintiffs as set forth above.

248.   State Farm, Rehabilitation Planning, Inc., Jane McBride, D.C., and Goldberg, Miller & Rubin, P.C. each conducted or participated directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of, but not limited to the following instances of mail and wire fraud:

a)    8/27/08 letter mailed to Rehabilitation Planning by State Farm seeking a peer review of the treatment provided to James Nelson;

b)    8/27/08 letter mailed to Plaintiffs from State Farm relating decision to seek peer review of the treatment of James Nelson;

c)    9/2/08 letter mailed to Plaintiffs from Rehabilitation Planning requesting records of treatment for James Nelson;

e)    10/6/08 telephone call from Dr. McBride to Plaintiffs;

f)    10/8/08 telephone call from Dr. McBride to Plaintiffs;

g)    10/10/08 telephone call from Dr. McBride to Plaintiffs;

h)    10/15/08 telephone call from Dr. McBride to Plaintiffs;

i)    10/15/08 letter mailed to State Farm from Rehabilitation Planning enclosing the fraudulent peer review purportedly authored by Jane McBride, D.C.;

j)    10/15/08 letter mailed from State Farm to Plaintiffs enclosing the alleged peer review report of Dr. McBride concerning the treatment of James Nelson;

k)    3/11/10 letter from State Farm adjuster Nova Crespo to Plaintiffs concerning the claim of Anthony Fullwood;

l)      4/12/10 letter from State Farm adjuster Nova Crespo to Plaintiffs concerning the claim of Anthony Fullwood;

m)      5/20/10 letter from State Farm adjuster Nova Crespo to Plaintiffs concerning the claim of Anthony Fullwood;

n)      5/4/10 letter from Goldberg, Miller & Rubin, P.C. to Stuart Carpy, Esquire concerning matter of Philadelphia Pain Management v. State Farm;

o)      5/11/10 letter from Goldberg, Miller & Rubin, P.C. to David Pallet, Esquire concerning Anthony Fullwood;

p)      5/14/10 letter from Goldberg, Miller & Rubin, P.C. to Stuart Carpey, Esquire concerning Philadelphia Pain Management v. State Farm;

q)      5/17/10 letter from Goldberg, Miller & Rubin, P.C. to Robert O'Grady, Esquire concerning Anthony Fullwood;

r)      6/3/10 telephone call from Doug Babin to Arlene O'Brien;

249.    These acts of mail and wire fraud were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5).

250.    The conduct of State Farm constitutes a violation of 18 U.S.C. §1962(c).

251.    Plaintiffs were directly injured in their business and property as set forth in paragraph 233 above by State Farm's violations of 18 U.S.C. §1962(c). Other injuries suffered by Plaintiffs in their business and property by defendants' violations of 18 U.S.C. §1962(c) include the deprivation of the full amounts legally owed for treatment rendered to State Farm insureds between 2000 and the present, along with the expenses incurred in the effort to obtain the full payment legally owed for treatment of State Farm insureds since

2000, as well as such other injury as may be revealed in discovery and proven at trial in this matter.

WHEREFORE, pursuant to 18 U.S.C. §1964(c), Plaintiffs demand judgment in their favor and against defendants for compensatory damages, treble damages, punitive damages, interest, costs, attorneys' fees, and such other relief as the court shall find just and equitable.

### COUNT VI
### DR. PETER SCHATZBERG & PHILADELPHIA PAIN MANAGEMENT, INC. V. STATE FARM
### VIOLATION OF 18 U.S.C §§1962(d)
### CONSPIRACY TO VIOLATE RICO

252.    All of the preceding paragraphs are incorporated herein as if fully set forth at length.

253.    Plaintiffs are "persons" within the meaning of 18 U.S.C. §1961(3) and 1964(c).

254.    Defendants are "persons" within the meaning of 18 U.S.C. §1961(3) and 1962(c).

255.    At all times material hereto, but since at least the year 2000, State Farm, Rehabilitation Planning, Jane McBride, D.C., and the law firm of Goldberg, Miller & Rubin, P.C., have been and continue to be associated in fact and thus constitute an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c)(hereinafter "the enterprise").

256.    The enterprise has been and continues to be centrally controlled by State Farm for the purpose of effectuating the ACE scheme outlined above.

257.    At all times material hereto, the enterprise was engaged in and its activities affected interstate commerce and the facilities of interstate commerce, including the United States mails, highways, and telephone lines.

258.    At all times material hereto, State Farm, Rehabilitation Planning, Inc., Jane McBride, D.C., and Goldberg, Miller & Rubin, P.C. were employed by or otherwise associated with the enterprise.

259.   From at least 2000 through to the present and continuing into the future, State Farm, Rehabilitation Planning, Inc., Jane McBride, D.C., and Goldberg, Miller & Rubin, P.C. devised and participated in a scheme to defraud Plaintiffs as set forth above.

260.   State Farm, Rehabilitation Planning, Inc., Jane McBride, D.C., and Goldberg, Miller & Rubin, P.C. each conspired and agreed amongst themselves to violate 18 U.S.C. §1962(c), that is to conduct or participate directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of, but not limited to the following instances of mail and wire fraud:

a)      8/27/08 letter mailed to Rehabilitation Planning by State Farm seeking a peer review of the treatment provided to James Nelson;

b)      8/27/08 letter mailed to Plaintiffs from State Farm relating decision to seek peer review of the treatment of James Nelson;

c)      9/2/08 letter mailed to Plaintiffs from Rehabilitation Planning requesting records of treatment for James Nelson;

e)      10/6/08 telephone call from Dr. McBride to Plaintiffs;

f)      10/8/08 telephone call from Dr. McBride to Plaintiffs;

g)      10/10/08 telephone call from Dr. McBride to Plaintiffs;

h)      10/15/08 telephone call from Dr. McBride to Plaintiffs;

i)      10/15/08 letter mailed to State Farm from Rehabilitation Planning enclosing the fraudulent peer review purportedly authored by Jane McBride, D.C.;

j)      10/15/08 letter mailed from State Farm to Plaintiffs enclosing the alleged peer review report of Dr. McBride concerning the treatment of James Nelson;

k)      3/11/10 letter from State Farm adjuster Nova Crespo to Plaintiffs concerning the claim of Anthony Fullwood;

l)      4/12/10 letter from State Farm adjuster Nova Crespo to Plaintiffs concerning the claim of Anthony Fullwood;

m)      5/20/10 letter from State Farm adjuster Nova Crespo to Plaintiffs concerning the claim of Anthony Fullwood;

n)      5/4/10 letter from Goldberg, Miller & Rubin, P.C. to Stuart Carpy, Esquire concerning matter of Philadelphia Pain Management v. State Farm;

o)      5/11/10 letter from Goldberg, Miller & Rubin, P.C. to David Pallet, Esquire concerning Anthony Fullwood;

p)      5/14/10 letter from Goldberg, Miller & Rubin, P.C. to Stuart Carpey, Esquire concerning Philadelphia Pain Management v. State Farm;

q)      5/17/10 letter from Goldberg, Miller & Rubin, P.C. to Robert O'Grady, Esquire concerning Anthony Fullwood;

r)      6/3/10 telephone call from Doug Babin to Arlene O'Brien;

261.   These acts of mail and wire fraud were both related and continuous, thereby constituting a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5).

262.   The conduct of State Farm constitutes a violation of 18 U.S.C. §1962(d).

263.   Plaintiffs were directly injured in their business and property as set forth in paragraph 233 above by State Farm's violations 18 U.S.C. §1962(d).  Other injuries suffered by Plaintiffs in their business and property by defendants' violations of 18 U.S.C. §1962(d) include the deprivation of the full amounts legally owed for treatment rendered to State Farm insureds between 2000 and the present, along with the expenses incurred in the

effort to obtain the full payment legally owed for treatment of State Farm insureds since 2000, as well as such other injury as may be revealed in discovery and proven at trial in this matter.

WHEREFORE, pursuant to 18 U.S.C. §1964(d), Plaintiffs demand judgment in their favor and against defendants for compensatory damages, treble damages, punitive damages, interest, costs, attorneys' fees, and such other relief as the court shall find just and equitable.

Respectfully submitted,
BARATTA, RUSSELL & BARATTA

By: ANDREW P. BARATTA, ESQUIRE
Attorney for Plaintiff
Attorney I.D. #82250
3500 Reading Way
Huntingdon Valley, PA   19006
(215) 914-2222

Date:      July 20, 2010

# VERIFICATION

Plaintiff, Dr. Peter Schatzberg, hereby verifies that the information contained in the foregoing is based on first-hand information and on information furnished to counsel and obtained by counsel in the course of this lawsuit. The language of the document is that of counsel and not of the affiant. To the extent that the contents of the document are based on information furnished to counsel and obtained by counsel during the course of this lawsuit, the affiant has relied upon counsel in taking this verification. All statements are founded upon reasonable belief. The undersigned understands that the statements therein are made subject to the penalties of 18 Pa.C.S. §4904 relating to unsworn falsification to authorities.

**Dr. Peter Schatzberg**